AO 106 (Rev. 04/10)  Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE:  __EMJ 6/17/2024__

# UNITED STATES DISTRICT COURT
### for the
### Western District of Oklahoma

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

902 Freeland Drive, Enid, Oklahoma 73701 WITH ACCESS AND
CONTROL OF THE ATTACHED GARAGE, ALL OUTBUILDINGS,
VEHICLES, AND CURTILAGE

)
)
)
)
)
)

Case No.  MJ-24- 513-SM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference herein.

located in the _____Western_____ District of _____Oklahoma_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. s. 2252A(a)(5)(B) | Possession of Materials Containing Child Pornography |

The application is based on these facts:

See the attached Affidavit of HSI Special Agent Elizabeth Hancock, which is incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Elizabeth Hancock, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 17, 2024

City and state:  Oklahoma City, Oklahoma

_____
*Judge's signature*

SUZANNE MITCHELL, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Elizabeth Hancock, a Special Agent ("SA") with Homeland Security Investigations ("HSI"), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I have been employed as a SA with Homeland Security Investigations ("HSI") since August 2019, and am currently assigned to work human trafficking, child exploitation, and intellectual property rights cases in Oklahoma City, Oklahoma.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  In 2009, prior to becoming a Special Agent, I attended the Police Academy and received a Texas Commission on Law Enforcement ("TCOLE") law enforcement certificate as a Patrol Officer for the Nacogdoches Police Department in Nacogdoches, Texas.  In 2014, I became a Detective at the Angelina County Sheriff's Office in Lufkin, Texas.  As a Detective, I predominantly investigated "Crimes Against People," specifically exploitation of children. In securing said commission, I received formal law enforcement training, to include over twenty-three weeks at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, as it pertains to the investigating and enforcing violations of Federal law, including violations of Federal customs and smuggling statutes, as well as child exploitation crimes.

2.     This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the locations specifically

described in Attachment A of this Affidavit and located at 902 Freeland Drive, Enid, Oklahoma, 73701 (the **"SUBJECT PREMISES"**), including the entire residence, curtilage, appurtenances, and vehicles parked thereon, any detached garages or sheds, and any person present for property that constitutes: evidence of the commission of a criminal offense; contraband, the fruits of crime, and things otherwise criminally possessed; and property designed and intended for use, and which has been used as a means of committing criminal offenses, namely, the violation of 18 U.S.C. § 2252A(a)(5)(B), possession of child pornography. As set forth below, I have probable cause to believe that such property and items reasonably believed to belong to or have been used by Christopher A. Ullrich located therein, as described in Attachment B, including any digital devices or electronic media, are currently located at the **SUBJECT PREMISES**.

3.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement personnel, written reports, and surveillance conducted. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts that are necessary to establish probable cause that contraband and evidence, fruits, and instrumentalities of a violation of 18 U.S.C. § 2252A(a)(5)(B), possession of child pornography, are presently located at the **SUBJECT PREMISES**.

## DEFINITIONS

4.    The following definitions apply to this Affidavit and Attachment B:

a.    "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

b.    "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.    "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such devices: and includes smartphone, and mobile phones and devices." *See* 18 U.S.C. § 1030(e)(1).

d. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input-output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

e. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password, a string of alpha-numeric characters, usually operates what might be termed a digital key to "unlock" data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected

data to make it inaccessible or unusable, as well as reverse the process to restore it.

f. "Internet Protocol address," or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigned a user's computer a particular IP address that is used each time the computer accesses the Internet.

g. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

h. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

i. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

j. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite

sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

k. A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks; RAM; "thumb," "jump", or "flash" drives; CD/DVDs; and other magnetic or optical media.

l. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversation into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether stored in a permanent format.

## **PROBABLE CAUSE**

5.     In November of 2022, HSI Oklahoma City, Oklahoma SAs received information regarding online child exploitation activities. The following information was gathered from the different agents conducting investigative activities and is a summation of facts regarding this case.

6.     In or about October 2022, HSI became involved in a covert, online investigation involving offenders trading child pornography in chat groups on an encrypted instant messaging application hereinafter referred to as "APPLICATION X."[1]  The

---

[1] The actual name of the live chatroom on "APPLICATION X" is known to law enforcement. The live chat room located on "APPLICATION X" remains active, and disclosure of the name of the live chat room and encrypted instant messaging application would potentially alert its users to the fact that law enforcement action is being taken against users on "APPLICATION X," thereby provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, to protect the

The UCA asked how old the child was, and dumbdumb3223@gmail.com sent the following:

"It turns me.on.yes.8" (11:59 am)

User dumbdumb3223@gmail.com then sent a digital image of a female child wearing glasses, which looked like it was taken in a classroom setting. User dumbdumb3223@gmail.com claimed this child was his daughter and posted the following:

9.    "I want to get some.of her naked I have thought about hiding a camera in her bathroom or room sometime" (12:15 pm)

10.    UCAs sent Oklahoma City Special SA Rachel Cathie folders containing the suspected CSAM digital images/videos they captured during the initial investigation. The folders also contained screen recordings of the APPLICATION X chats in which user dumbdumb3223@gmail.com was a member.

11.    SA Cathie observed the images/videos sent to her, which included approximately seven images and 11 videos sent by user dumbdumb3223@gmail.com to other users in the APPLICATION X chat forum. Descriptions of some of the files she observed are as follows:

a. Screen Recording from November 24, 2022:

i. On November 24, 2022, at approximately 12:27 a.m., the user dumbdumb3223@gmail.com posted a digital image of a female child, possibly a toddler, with dark hair, who was wearing a black mask around her nose and mouth. In the image, the female child is sitting

on a desk chair, fully nude, with her legs spread, exposing her vaginal area.

ii.  On November 24, 2022, at approximately 5:01 a.m., the user dumbdumb3223@gmail.com posted a video titled "fingering-sleepi…ull-quality.webm," which was one minute and 40 seconds in duration. The video depicts a female child asleep on a mattress on the floor with a patterned blanket covering her. The person filming the child lifts the blanket to expose the child's buttocks and breast area. The person filming then lifts the blanket again to expose the child's genital area. The person filming continues to film himself digitally penetrating the child's vaginal and anal areas.

iii. On November 24, 2022, at approximately 3:17 p.m., the user dumbdumb3223@gmail.com posted a digital image of a young female child with light hair, who was wearing a bathing suit and high heels. The user dumbdumb3223@gmail.com commented, "Made to look like hookers and strippers." The user dumbdumb3223@gmail.com posted another digital image of a young female child, who was wearing light-colored heels with laces tied to the child's knees and a pink outfit. The child had her legs spread with her hands covering her genital area.

b.  Screen Recording on November 25, 2022:

    i.  On November 25, 2022, at approximately 5:45 a.m., the user dumbdumb3223@gmail.com posted a file titled "VID_2020702_153857_855.mp4."  On the same date, the user dumbdumb3223@gmail.com posted a digital image of a young female child, who was wearing a black leather strap around her mouth. The child's hands were bound, and there appeared to be mark on the child's chest similar to markings left after being struck by an object like a belt.  The child is completely nude with her vaginal area exposed.  On the same date, the user dumbdumb3223@gmail.com posted a digital image of a young naked female child lying on a towel. The child's legs are bound by ropes, and her hands are tied above her head.  The child is also wearing a blindfold over her eyes.  On the same date, the user dumbdumb3223@gmail.com posted another digital image of a young female child lying on a bedspread, completely nude, with both arms bound to her feet with ropes.  Her legs were spread upwards toward her head, and silver duct tape was covering her mouth. The child's genitals were fully exposed.

    ii.  On November 25, 2022, at approximately 5:57 a.m., the user dumbdumb3223@gmail.com posted another digital image of a young female child sitting on a toilet with a spiked, choker-style collar around the child's neck, as well as a ball gag in the child's mouth.

The child's vaginal area is completely exposed, and the child is nude. Another user identified as "addme1234321" posted, "Amazing stuff guys," and the user dumbdumb3223@gmail.com posted, "How all little girls should be treated."

c. Screen Recording on November 25, 2022:

   i. On November 25, 2022, at approximately 2:07 p.m., he user dumbdumb3223@gmail.com posted a digital image of a young female child, who was fully clothed in a long-sleeved shirt and pants. The child's face is not visible, and the camera is directed toward the child's genital area. The user dumbdumb3223@gmail.com is the moderator of this chatroom, which is titled "real family," and there is a description that reads, "for real.family members." The chat conversations appear to be of individuals posting about sexually abusing family members.

d. Screen Recording on November 26, 2022:

   i. This is a screen recording of the "real family" chat group. At approximately 6:00 p.m., the user dumbdumb3223@gmail.com posted a digital image of a young female child, who was wearing a shirt and leggings. The child's eyes appeared to be blurred out, and the child is lying on her back with her legs spread. The user dumbdumbd3223@gmail.com posted another digital image of a young female child, who was wearing a gymnastics leotard. The child

is performing the splits and smiling at the camera. At approximately 7:17 p.m., the user dumbdumb3223@gmail.com posted, "Try and send only real family stuff."

e. Screen Recording on November 29, 2022:

i. This is a screen recording of a chat room titled, "Tod and socks and panty." At approximately 7:06 p.m., the user dumbdumb3223@gmail.com posted a digital image of a female child, and someone off-camera is physically opening the child's vaginal area in order to take a picture. The user dumbdumb3223@gmail.com posted a video titled "-47806463558287457127.mp4." The video depicts a grown male subject rubbing his penis on a naked female child's vaginal area. The user dumbdumb3223@gmail.com commented, "Object insertion rom."

f. Session Recording on November 29, 2022:

i. On November 29, 2022, at approximately 7:14 p.m., the user dumbdumb3223@gmail.com posted a video file titled, "3338578509825568521.mp4." The video depicts a young female child lying on her back, who was wearing a shirt, and the child's underwear is pulled down to expose the child's vaginal area. The child appears to be asleep. The person holding the camera then pans from the child's face back to the child's vaginal area. The person

holding the camera then spreads the child's vagina open, so it is visible to the camera.

g. Session Recording on December 5, 2022:

i. On December 5, 2022, at approximately 5:27 a.m., the user dumbdumb3223@gmail.com posted a digital image of a female child lying on her side, who was wearing underwear. The child appears to be sleeping. The user dumbdumb3223@gmail.com commented under this picture, "she [m]ust be a dirty little bitch," and "My daughter is 8."

12.     In December of 2022, HSI SAs sent separate summonses to both Google and T-Mobile regarding information associated with the chat conversations listed above. The subscriber information listed Warren H. Ullrich. The address provided was 902 Freeland Drive, Enid, Oklahoma 73701 (the "**SUBJECT PREMISES**"), and the telephone number listed was 580-557-9873, which was linked to a ZTE Blade cellular telephone. Law enforcement records checks, and open-source queries, associated Christopher A. ULLRICH (hereinafter, "ULLRICH") with the information above.

13.     For example, C. ULLRICH is a registered sex offender in Oklahoma, and he appeared to be currently residing at the **SUBJECT PREMISES** based upon his sex offender registration and his driver's license. According to the sex offender registry, C. ULLRICH has currently reported he is living at the **SUBJECT PREMISES** with Warren ULLRICH and no other parties. The telephone number 580-557-9873 also showed to be a real-time phone associated with C. ULLRICH. Records checks indicated that C.

ULLRICH was previously convicted of Possession and Distribution of Child Sexual Abuse Material in 2016 in Garfield County, which is Enid, Oklahoma (Case Number CF-2011-00726).

14.    I requested information regarding any employment history for C. ULLRICH. According to the Oklahoma Employment Security Commission ("OESC"), C. ULLRICH was employed by Mid-Continent Packaging Inc., which is located at 1200 N. 54th Street in Enid, Oklahoma. This information showed his last known employment with this company during the second quarter of 2023 through the fourth quarter of 2023.

15.    I requested mailing information for anyone receiving mail at the **SUBJECT PREMISES**. I received information from the United States Postal Inspection Service that Warren and C. ULLRICH are the only parties receiving mail at the **SUBJECT PREMISES**.

16.    I also requested information from the Oklahoma Department of Human Services ("DHS") Child Protective Services ("CPS") regarding the **SUBJECT PREMISES**. According to their records, children previously resided at the **SUBJECT PREMISES** in 2012. Those children belonged to C. ULLRICH's brother, and the family has been living elsewhere since 2013.

17.    On February 13, 2023, SA Cathie conducted surveillance at the **SUBJECT PREMISES**. No activity was observed, and the surveillance was terminated.

18.    Later in the investigation involving APPLICATION X, HSI SAs observed a particular user of APPLICATION X, who posted under the username "nomercy5," share child pornography in various chat groups of the application. An HSI SA has accessed and

viewed child pornography files that were posted within group chats on APPLICATION X in an undercover capacity from computers in the District of New Jersey. Specifically, in March of 2023, the UCA was monitoring multiple chat rooms on APPLICATION X and was able to capture and download the distribution of child pornography by multiple targets. This included the uploading of images/videos by nomercy5.

19.   The UCA was able to observe and capture nomercy5's chat activity in nine different chat groups dedicated to the exchange and discussion of child pornography and child erotica. These chat groups have names that are indicative of the sexual abuse content shared therein, including terms such as "pedo," "babies," "0-5," "kids," and "hardcore."

20.   On various dates in or around March of 2023, the UCA observed nomercy5 post both viewable videos and images, as well as links to images and videos in these chat groups. The images and videos shared by the nomercy5 included depictions of minors engaged in sexually explicit conduct, including the oral, vaginal, and anal penetration of prepubescent minors and infants, as well as lascivious depictions of the genitals of prepubescent minors and infants. User nomercy5 also posted sadistic images and videos involving the abuse and/or the torture of prepubescent minors. The UCA also observed and captured other users commenting on or "liking" nomercy5's posts. In the course of the chats captured by the UCA, nomercy5 made multiple comments in these groups about his desire to beat and rape infants and young children. User nomercy5 also alluded to having "some experience" with hands-on sexual abuse of minors.

21.    HSI sent an administrative summons to the provider of APPLICATION X, seeking information associated with nomercy5, including information relating to Push Token identifications.

22.    When the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, which is a unique identifier that allows the provider associated with the application to locate the device on which the application is installed.  After the applicable push notification service (*e.g.,* Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.,* the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's servers. Accordingly, a provider's computers are likely to contain useful information that may help to identify the specific devices used by a particular subscriber to access the subscriber's account via the mobile application.

23.    In response to HSI's administrative summons, the providers of APPLICATION X provided information that the username mentioned by nomercy5 was associated with Google Cloud Messaging ("GCM") IDs. The results of the court order for the Push Token information provided identifying information of nomercy5 in ULLRICH's name, as well as some of the same information previously found during law

enforcement records checks for ULLRICH: (1) Google Account ID christopheraullrich@gmail.com; (2) Android ID International Mobile Equipment Identifying ("IMEI") number 357032230958516; (3) Google Account ID number 1069161874729 to Christopher Ullrich; (4) telephone number (580) 551-9293; and (5) birthday showing July 17, 1982, the same as Christopher A. ULLRICH's birthday.

24.     I believe ULLRICH is utilizing different accounts, including both dumbdumb3223 and nomercy5, to engage in criminal activity online, namely the exploitation of children through posts uploaded to APPLICATION X. I also believe that, based on my training and experience, ULLRICH will still be in possession of some, if not all, the images he has uploaded and, most likely, downloaded during the transmission of the child pornography online.

## CHARACTERISTICS COMMON TO CHILD PONROGRAPHY COLLECTORS

25.     As a result of my consultations with other law enforcement officers, both federal and state, who have considerable experience investigating the sexual exploitation of children, and my own experience, I have learned about the individuals engaged in child exploitation activities and about the computer technology available to, and utilized by, those individuals. I have learned that individuals engaged in the production, procurement, trade, and/or transmission of child exploitation through the United States mail, computer, or other interstate conveyance commonly:

      a.     Receive sexual gratification and satisfaction from actual physical contact with children and from fantasy that may be simulated by producing and viewing children engaged in sexual activity or in sexually suggestive poses.

b.  Own and operate photographic production and reproduction equipment. This equipment is often digital cameras which include both cameras which take still images and movie files.

c.  Collect sexually explicit or suggestive materials of adults and/or children consisting of photographs, magazines, motion pictures, videotapes, books, slides, computer images, drawings or other visual media for their own sexual arousal and gratification, and in some instances, to lower the inhibitions of children they are attempting to seduce, and/or to arouse and to demonstrate their desired sexual acts to their selected partners or victims.

d.  Often do not dispose of their collection of sexually explicit material. If the material is discarded or lost due to computer malfunction, these individuals often replenish their supply of child exploitation materials very quickly.

e.  Correspond with individuals who share their same interest in child exploitation materials, and maintain their names, addresses, telephone numbers, and other identifying information in lists, telephone books, address books, scraps of paper, or on computer disks.

f.  Obtain, collect, and maintain photographs of children they are or have been involved with, which may depict children fully clothed, in various states of undress, totally nude, or in various activities, which are often held for lengthy period.

g.    Collect books, magazines, newspapers, and other writings about sexual assaults of children to understand their own feelings toward children, to justify their feelings, and to find countenance for their illicit behaviors and desires.

h.    Commonly collect items which could be any material relating to children that serve a sexual purpose for a given individual. These items as used herein, have been termed "child erotica" and so defined by now retired Special Agent Ken Lanning, Federal Bureau of Investigation. *See* Kenneth Lanning, Child Molesters: A Behavioral Analysis (2001) at page 65. Some of the more common types of "child erotica" include photographs that are not sexually explicit, drawings, sketches, fantasy writings, diaries, and sexual aids. Federal courts have recognized the evidentiary value of child erotica and its admissibility in child exploitation cases. *United States v. Riccardi*, 258 F.Supp.2d 1212 (D. Kan. 2003); *United States v. Caldwell*, 181 F.3d 104 (6th Cir. 1999) (unpublished) (child erotica admissible under Federal Rules of Evidence 404(b) to show knowledge or intent).

i.    Often do not discard the child exploitation material but collect it over a long period of time and maintain this material in the privacy of their homes. Sometimes, individuals using peer-to-peer software will engage in a routine where they may delete their child exploitation material after they have viewed it several times and then, after the deletion occurs, the individual will replenish their supply via their peer-to-peer connection when they desire more images to satisfy their sexual interest in children. This procurement and purging cycle results in evidence of their current child exploitation materials being easily located on their computer,

as well as evidence of their deleted material remaining on their computer, which can be recovered by a forensic computer examiner.

j.     In my experience and that of other law enforcement agents with experience investigating child exploitation crimes, individuals who trade and share child exploitation material via the Internet retrieve and store the child exploitation materials (whether they produced it or obtained it from other sources) on an electronic storage device as previously stated. As also previously stated, individuals who trade and share child exploitation materials tend to retain their collection of child exploitation materials on digital media (such as hard drives, computers and/or cell phones), which can be stored for a very long amount of time, and tend to keep their collection nearby and secured, usually within their residence or on their person. It is well-known that when individuals relocate from one residence to another, they take their valued possessions (such as vehicles, furniture, clothes, important documents, computers, electronic devices, etc.) with them and store them in their new residence.

26.    Based on the facts set forth above, I believe that Christopher ULLRICH engaged in the above-described illegal activities and that a search of the **SUBJECT PREMISES** at a time when he is present will result in the seizure of devices reasonably believed to belong to or have been used by ULLRICH containing child pornography and related evidence. I say "when he is present" because in the year 2024, a person's cell phone is almost always in the same place as the person. Thus, if the search is executed when

ULLRICH is present, then his cell phone will almost surely be there too, as well as other computers.

## COMPUTERS, THE INTERNET, AND CHILD EXPLOITATION

27.    I have had training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a.    Computers and digital technology have dramatically changed the way in which individuals interested in child exploitation interact with each other. Computers basically serve four functions in connection with child exploitation: production, communication, distribution, and storage.

b.    Individuals involved in child exploitation can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras and smartphones with cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera or smartphone to the computer. In the last ten years, the resolution of pictures taken by digital cameras and smartphones has increased dramatically, meaning that such pictures have become sharper and crisper. Photos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards often store up to 256 gigabytes of data, which provides enough space to store thousands of high-resolution photographs and videos. Video camcorders, which once recorded video onto tape or mini-CDs, now can save video footage in a digital

format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

      c.    A device known as a modem allows any computer to connect to another computer using telephone, cable, or wireless connection. Electronic contact can be made to millions of computers around the world. The ability to produce child exploitation images/videos easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child exploitation images/videos. Child exploitation can be transferred via electronic mail or through file transfer protocols ("FTP"s) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "instant messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child exploitation materials.

      d.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child exploitation materials. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. Given the storage capabilities, modern computers can retain many years' worth of a user's data, stored indefinitely. Even deleted data can often be forensically recovered. In addition, there are numerous options available for the storage of computer or digital files. One-terabyte external and internal hard drives are not uncommon.

e.    Other media storage devices include CDs, DVDs, and "thumb" "jump" or "flash" drives, which are very small devices which are plugged into a port on the computer.  It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them).

f.    Some media storage devices can easily be concealed and carried on an individual's person.  Smartphones and/or mobile phones are also often carried on an individual's person.  Smartphones and/or mobile phones are also often carried on an individual's person or in their immediate vicinity.  Digital files can be quickly and easily transferred back and forth between computers (as broadly defined in 18 U.S.C. § 1030(e)) and other digital file storage devices or stored simultaneously on them.  For example, smartphones can often synch with a traditional desktop or laptop computer.  This can result in files being transferred from the smartphone to the computer or even stored on both devices simultaneously.  Thus, I am requesting to seize all computers and digital file storage devices at the **SUBJECT PREMISES** and search them.

g.    The Internet affords individuals several different venues for obtaining, viewing, and trading child exploitation materials in a relatively secure and anonymous fashion.  For example, distributors of child exploitation materials can

use membership-based/subscription-based Web sites to conduct business, allowing them to remain relatively anonymous.

h.    Individuals also use online resources to retrieve and store child exploitation materials, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases here online storage is used, however, evidence of child exploitation can be found on the user's computer or external media in most cases.

i.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (i.e., by saving an email as a file on the computer or saving the locations of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data. Accordingly, a computer forensic examiner can often find evidence of deleted files on a user's computer. Thus, if a user has downloaded image files, viewed them,

then deleted them, a computer forensic examiner could oftentimes find evidence of such actions and maybe even the deleted images themselves.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS AND BIOMETRIC ACCESS TO DEVICE(S)

28.    As described herein and in Attachment B, this Warrant permits law enforcement agents to search for records that may be found on the **SUBJECT PREMISES**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media, such as a cellular phone, smartphone, or tablet. Thus, this Warrant would authorize the seizure of electronic media storage or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

29.    I submit that if a computer or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my training and experience and information relayed to me by other law enforcement agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud"

storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for several reasons, including the following:

b. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software is use today that it is impossible to bring to the search site all the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

c. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden." erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis or of the equipment and storage devices from which the data will be extracted.

d.  The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.

e.  Computer users can attempt to conceal data within computer equipment and storage devices through several methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

30.  Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for contraband, evidence, fruits, or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords), so that a qualified

computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

   a. The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require input-output devices to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

   b. To fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit ("CPU"). Further, the analyst needs all system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

   31.    Additionally, based on my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of a crime. This is equally true of

so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly.  Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime— including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network.  Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

32.    Additionally, I request that this warrant permits law enforcement agents to obtain from namely Christopher ULLRICH the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) subject to search and seizure pursuant to this warrant.  The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a

numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finer to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on

devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patters within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e. In my training and experience, users of electronic devices often enable the biometric features because they are a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are a more secure way to protect a device's content. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f. As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the electronic devices subject to search under this warrant

currently are not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the electronic devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain time. For example, certain Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has been unlocked using a fingerprint for eight hours and the passcode or password has not been entered in the last six days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that

person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require ULLRICH, if he is found at the **SUBJECT PREMISES** and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

i.  Due to the foregoing, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant would permit law enforcement personnel to obtain from ULLRICH if located in the **SUBJECT PREMISES** the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of ULLRICH to the fingerprint scanner of the device(s) found at the **SUBJECT PREMISES**; (2) hold the device(s) found at the **SUBJECT PREMISES** in front of the face of ULLRICH to activate the facial recognition feature;

and/or (3) hold the device(s) found at the **SUBJECT PREMISES** in front of the face of ULLRICH to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

j.      The proposed warrant does not request authority for nor authorize law enforcement to compel ULLRICH to state or otherwise provide the password for, or to identify which specific biometric characteristics (including the unique finger(s) or other physical features) may be used to unlock or access any device(s).  However, during the execution of the requested warrant, law enforcement agents may seek to obtain such information voluntarily from ULLRICH at the **SUBJECT PREMISES.**

## CONCLUSION

33.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at the location(s) described in Attachment A. I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

34.     I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by this Court, the return will not include evidence later examined by a forensic analyst.

Elizabeth Hancock
Special Agent
Homeland Security Investigations

Sword and subscribed before me this _____ 17ᵗʰ _____ day of June 2024.

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## DESCRIPTION OF LOCATION(S) TO BE SEARCHED

The entire property located at 902 Freeland Drive, Enid, Oklahoma 73701, including any residential building, the attached garage, any outbuildings, vehicles, and any appurtenances thereto (the "**SUBJECT PREMISES**"). The **SUBJECT PREMISES** is a single-story brick dwelling with light colored window accents. The residence is located on the west side of Freeland Drive, generally facing east. There is an attached garage located on the north side of the dwelling.







## ATTACHMENT B

## ITEMS TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use, or which is or has been used as the means of committing a criminal offense, namely a violation of Title 18, United States Code, Section 2252A(a)(5)(B):

1.      Books and magazines containing visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or relating to the sexual exploitation of minors or a sexual interest in children.

2.      Originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or relating to the sexual exploitation of minors or a sexual interest in children.

3.      Stories, text-based files, motion pictures, films, videos, and other recordings or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or relating to the sexual exploitation of minors or a sexual interest in children.

4.      Information, correspondence, records, documents, or other materials pertaining the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or pertaining to the sexual exploitation of minors or a sexual interest in children, that were transmitted or received using a computer, cellular device, personal digital assistant, or some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail, including, but not limited to:

a.      Cellular telephones, smartphones, tablets, personal digital assistants, computers, computer systems, computer hardware, computer software, tapes, cassettes, cartridges, streaming tape, commercial software, commercial hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, tape systems, and other computer related operation equipment;

b.      Digital cameras, scanners, monitors, printers, external storage devices, computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums;

c.      Envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256 or relating to the sexual exploitation of minors or a sexual interest in children;

d.      Books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by

United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256 or relating to the sexual exploitation of minors or a sexual interest in children];

e.      Any and all records, documents, or materials, including any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce including by United States mail or by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256 or relating to the sexual exploitation of minors or a sexual interest in children;

f.      Any and all records, documents, or materials, including any and all address books, names, and lists of names and addresses of minors visually depicted while engaging in sexually explicit conduct, defined in Title 18, United States Code, Section 2256; or relating to the sexual exploitation of minors or a sexual interest in children;

g.      Any and all records of Internet usage including usernames and e-mail addresses and identities assumed for the purposes of communication on the Internet. These records may include billing and subscriber records, chat room logs, e-mail messages, and include electronic files in a computer and on other data storage mediums, including CDs or DVDs;

h.    Any physical keys, encryption devices, dongles and similar physical items necessary to access computer equipment, storage devices or data;

i.    Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data; and

j.    Files, records, programs, logs, electronic communications, scanning programs, financial records, hacking software, or router configuration software media.

5.    Computers or storage media used to commit the violations described above.

6.    For any computer or storage medium who seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.    Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contact, "chat." instant messaging logs, photographs, and correspondences;

b.    Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     c.     Evidence of the lack of such malicious software;

     d.     Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation, and to the computer user;

     e.     Evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

     f.     Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

     g.     Evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

     h.     Evidence of the times the COMPUTER was used;

     i.     Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

     j.     Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

     k.     Records of or information about Internet Protocol addresses used by the COMPUTER;

     l.     Records of or information about the COMPUTER'S Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered in any Internet search engine, and records of user-typed web addresses;

m.    Contextual information necessary to understand the evidence described in this attachment; and

n.    Videos/digital images found during the search of the COMPUTER(S), including any of those items saved or taken by or on the COMPUTER(S) searched.

7.    Routers, modems, and network equipment used to connect computers to the Internet.

8.    All adapters, chargers, or other hardware necessary to charge the battery, or to maintain the functioning of, any equipment described above.

9.    Child pornography, as defined as 18 U.S.C. § 2256(8), and child erotica.

10.    Records, information, and items relating to violations of the statutes described above, including:

a.    Records, information, and items relating to the occupancy or ownership of the **SUBJECT PREMISES**, including utility and telephone bills, mail envelopes, or address correspondence.

b.    Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes.

c.    Records and information relating to the identity or location of the persons suspected of violating the statutes described above.

d.    Records and information relating to the sexual exploitation of children, including correspondence and communications between users on the Internet and social media.

e.    Records and information relating or pertaining to the identity of the person or persons using seized evidence.

During the execution of the search of the **SUBJECT PREMISES** described in Attachment A, law enforcement personnel are authorized to compel ULLRICH if reasonably believed to own the phones of other computer that use biometric encryption, to (1) press or swipe his fingers (including thumbs) to the fingerprint scanner of a device found at the **SUBJECT PREMISES**; and/or (2) hold a device found at the **SUBJECT PREMISES** in front of his face, for the purpose of attempting to unlock the device in order to search the contents as authorized by this Warrant.

As used above, the terms "records" and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro-SD cards, macro-SD cards, DVDs, gaming systems, SIM cards, cellular phones

capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.